UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| RAVEN L. RENFROW, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CAUSE NO. 3:14-CV-01922-CAN |
| | ) |
| CAROLYN COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

On September 25, 2014, Plaintiff Raven L. Renfrow ("Renfrow") filed a complaint in this Court seeking reversal of the Social Security Commissioner's final decision to deny her application for Supplemental Security Income ("SSI"). Alternatively, Renfrow seeks a remand for further consideration of her application. On April 28, 2015, Defendant, Commissioner of Social Security ("Commissioner"), filed a response asking the Court to affirm the decision denying benefits. This Court may enter a ruling in this matter based on the parties consent, 28 U.S.C. § 636(c), and 42 U.S.C. § 405(g).

**I.    PROCEDURE**

On September 14, 2011, Renfrow filed an application for SSI with the Social Security Administration ("SSA") pursuant to 42 U.S.C. § 1382 alleging disability beginning September 15, 2007. The SSA denied Renfrow's application initially on November 30, 2011, and then again on January 30, 2012, upon reconsideration. Based on a timely request, a hearing was held before an administrative law judge ("ALJ") on March 7, 2013. At the hearing, Renfrow and an impartial vocational expert appeared and testified. On April 23, 2013, the ALJ issued his

1

decision finding that Renfrow was not disabled at Step Five of the evaluation process and denying her application for benefits. 20 C.F.R. § 416.920(a). On June 26, 2014, the Appeals Council denied Renfrow's request for review, making the ALJ's decision the final decision of the Commissioner. Renfrow then sought judicial review of the Commissioner's final decision pursuant to sentence four of 42 U.S.C. § 405(g) by filing her complaint in this Court on September 25, 2014.

## II.  RELEVANT BACKGROUND

Renfrow was born on July 10, 1977, and was 34 years old the date she applied for SSI.[1] Renfrow dropped out of school at the age of 17. At the time of her March 2013 hearing before the ALJ, Renfrow was working as a stay-at-home mother, caring for her husband, her two children and their home. She was not engaging in work outside of the home.

### A.  The Plaintiff's Testimony

At the ALJ hearing, Renfrow testified that she suffers from bipolar disorder, schizo psychosis, attention deficit hyper disorder ("ADHD"), obsessive compulsive disorder ("OCD"), stress, and anxiety. Renfrow also testified that her anger makes it difficult to get along with people and that her OCD and ADHD are repetitive and constant. Renfrow further testified that if she does not keep herself busy, she has "crazy thoughts" that can turn into manic episodes; that she does not get along well in groups; and that she cannot socialize well due to her anger. In addition, Renfrow explained that she takes four different medications for ADHD, OCD, and anxiety and that she is "doing good now" on those medications.

---

[1] SSI is not payable prior to the month following the month in which the application was filed. 20 C.F.R. § 416.335. However, the ALJ considered Renfrow's complete medical history consistent with 20 C.F.R. § 416.912(d). *See* Doc. No. 12 at 27.

In addition, Renfrow testified that she gets along "very well" with her children. She stated that she is able to take care of her children because of her comfort level, testifying that "they're [her] children; they're [her] family, and she is around them every day." Doc. No. 12 at 60. In her testimony, Renfrow reported that both her mother and father suffer from severe bipolar disorder and that they would never stay in one place for more than a few months while she was growing up, which caused her to repeat the ninth grade "several times," and not finish school.

### B.  The Medical Evidence

Renfrow provided the ALJ with medical evidence that documented her visits to various doctors from October 21, 2007, shortly after the alleged onset date, through February 14, 2013, just before the ALJ hearing. The medical record and opinions show that Renfrow was treated for suicidal thoughts, clinical depression, bipolar disorder, ADHD, auditory hallucinations, schizoaffective disorder, post-traumatic stress disorder ("PTSD"), OCD, and a number of physical impairments, including anemia, hypothyroidism, high cholesterol, hip pain, and a vitamin B12 deficiency. Each of the physical impairments either resolved or became asymptomatic with only nominal conservative treatment. Renfrow's mental disorders changed throughout the relevant period and are classified under mood, anxiety-related, and personality disorders.

Renfrow's relevant medical experiences include a 2008 emergency room visit for suicidal thoughts and a 2009 visit to Dr. Linda Munson, D.O. for medication management. During inpatient treatment in November 2010, Renfrow was diagnosed with schizoaffective

3

disorder and ADHD and was assigned a global assessment of functioning ("GAF") score of 45.[2] Renfrow was successfully treated with medications and counseling. On Dr. Munson's recommendation, Renfrow also attended a psychiatric outpatient consultation with Dr. Umamaheswara Kalapatapu, M.D. in October 2011. Dr. Kalapatapu assigned Renfrow a GAF of 50 and documented that she was suffering from moderate mental symptoms at that time.

From mid-2010 through early 2013, Renfrow also received counseling at the Otis R. Bowen Center. Dr. Shivam Dubey, M.D. participated in several sessions with Renfrow in 2012. In January 2013, Dr. Dubey completed a medical source statement. Dr. Dubey assessed Renfrow as having poor to no skills in all categories, including social functioning and the ability to maintain attention and concentration. Further, he opined that Renfrow is unable to understand, remember, and carry out complex or detailed job instructions; behave in an emotionally stable manner; relate predictably in social situations; or demonstrate reliability. However, Dr. Dubey also opined that Renfrow is capable of managing her benefits.

In November 2011, Dr. Carrie A. Cadwell, Psy. D. conducted a consultative psychological evaluation on Renfrow. Dr. Caldwell assigned Renfrow a GAF of 62 finding that she was suffering only mild symptoms at that time. Additionally in November 2011, two State Agency psychological consultants, Dr. Kari Kennedy, Psy.D. and Dr. Donna Unversaw, Ph.D., reviewed Renfrow's file and completed a functional capacity assessment. They described her as having moderate limitations in such areas as the ability to understand, remember, and carry out detailed instructions; as well as the ability to interact appropriately with the general public and respond appropriately to changes in work settings. The State Agency consultants further found

---

[2] According to the *Diagnostic and Statistical Manual of Mental Disorders – Fifth Edition* (DSM-IV), a GAF rating of 41-50 indicates serious symptoms or serious impairment in social, occupational, or school functioning; 51-60 indicates moderate symptoms or difficulty; and 61-70 indicates some mild symptoms or difficulty.

that Renfrow could tolerate superficial, casual interactions with others and could also handle work settings with others.

### C. The ALJ's Determination

After the hearing, the ALJ issued a written decision reflecting the following findings based on the five-step disability evaluation prescribed by the SSA's regulations. *See* 20 C.F.R. § 416.920(a)(4). At Step One, the ALJ found Renfrow had not engaged in substantial gainful activity since her SSI application date of September 14, 2011. At Step Two, the ALJ found that Renfrow had the following severe impairments: schizoaffective disorder, PTSD, ADHD, and OCD. At Step Three, the ALJ found that Renfrow did not have an impairment or combination of impairments that meets or medically equals the severity of a listing. The ALJ then determined that Renfrow retained the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with some nonexertional limitations. Specifically, the ALJ found that Renfrow can never work around unprotected heights or moving mechanical parts due to the effects of her medications; is limited to simple, routine, and repetitive tasks; cannot perform at a production rate pace but can perform goal-oriented work; is limited to simple, work related decisions, occasional interaction with co-workers and supervisors, less than occasional contact with the public, and only few changes in work settings.

At Step Four, the ALJ found that Renfrow had no past relevant work. At Step Five, the ALJ found that considering Renfrow's age, education, work experience, and RFC, jobs exist in significant numbers in the national economy that she can perform. Based on these findings, the ALJ determined that Renfrow had not been disabled since September 14, 2011, and therefore did not qualify for SSI benefits.

### III. STANDARD OF REVIEW

On judicial review, under the Social Security Act, the Court must accept that the Commissioner's factual findings are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). When an ALJ's decision is the final action of the Social Security Administration, the reviewing court examines the ALJ's decision to determine whether substantial evidence supports it and whether the ALJ applied the proper legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 401 (1971). Substantial evidence is more than a mere scintilla but may be less than the weight of the evidence. *Id.*

The ALJ must build a logical bridge from the evidence to his conclusion and a reviewing court is not to substitute its own opinion for that of the ALJ, or to re-weigh the evidence. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). An ALJ must minimally express his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be certain that the ALJ considered the necessary evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). However, the ALJ need not specifically address every piece of evidence in the record. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010).

## IV. ISSUES FOR REVIEW

In this case, Renfrow contends that the ALJ's opinion does not support her RFC determination because (1) the ALJ improperly weighed the opinion of treating physician Dr. Dubey and (2) the ALJ made an erroneous credibility determination as to Renfrow's mental impairments. Renfrow also argues that the ALJ's Step Five analysis improperly relied upon

vocational testimony elicited in response to an incomplete hypothetical question. Each of these arguments is addressed in turn.

### A. RFC Analysis

An individual's RFC demonstrates her ability to do physical and mental work activities on a sustained basis despite functional limitations caused by any medically determinable impairment(s) and their symptoms, including pain. 20 C.F.R. § 416.945; SSR 96-8p 1996. In making a proper RFC determination, the ALJ must consider all of the relevant evidence in the case record. 20 C.F.R. § 416.945. The record may include medical signs, diagnostic findings, the claimant's statements about the severity and limitations of symptoms, statements and other information provided by treating or examining physicians and psychologists, third party witness reports, and any other relevant evidence. SSR 96-7p 1996. "Careful consideration must be given to any available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by objective medical evidence alone." SSR 96-8p. However, it is the claimant's responsibility to provide medical evidence showing how her impairments affect her functioning. 20 C.F.R. § 416.912(c). Therefore, when the record does not support specific physical or mental limitations or restrictions on a claimant's work related activity, the ALJ must find that the claimant has no related functional limitations. *See* SSR 96-8p.

### 1. The ALJ supported his RFC analysis with substantial evidence by identifying inconsistencies within Dr. Dubey's opinion and inconsistencies between Dr Dubey's opinion and the record.

Renfrow contends that the ALJ made an erroneous RFC determination by according little weight to the opinion of treating physician Dr. Dubey. Renfrow claims Dr. Dubey's opinion was

significantly more restrictive than the RFC defined by the ALJ. Further, Renfrow argues the ALJ improperly cherry-picked evidence to support his less restrictive RFC.

The opinion of a treating physician is given controlling weight when it is well-supported by clinical techniques and diagnostic testing and is not inconsistent with other medical evidence in the record. *Hofslien v. Barnhart,* 439 F.3d 375, 276 (7th Cir. 2006). However, where contradictory evidence is introduced and well-supported, a treating physician's opinion no longer controls and should be considered just another piece of evidence for the ALJ to weigh. *Id.* at 377. When a treating physician's opinion is not given controlling weight, however, the ALJ must weigh the opinion in light of the following factors: the claimant's examining and treatment relationship with the examiner; the opinion's supportability and consistency with the evidence in the record; the specialization of the physician; and any other factors the court believes tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(1)–(6). Ultimately, an ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical evidence. *See Schaaf v. Astrue,* 602 F. 3d 869, 875 (7th Cir. 2010). The ALJ should rely on medical opinions based on objective observations and not merely a narration of a claimant's subjective complaints. *See Rice v. Barnhart,* 384 F. 3d 363, 371 (7th Cir. 2004).

To determine whether the ALJ properly weighted a doctor's determinations, the Court must first identify what type of "medical source" opinion that doctor has offered. *See Simila v. Astrue*, 573 F. 3d 503, 514 (7th Cir. 2009). The mechanical rule that the views of a treating physician prevail has been disapproved for reasons including the fact that treating physicians often attempt to accommodate their patients. *See Peabody Coal v. McCandless,* 255 F. 3d 465, 469 (7th Cir. 2008). Preferring the opinion of the treating physician, who is often not a

specialist, over the opinion of a nontreating specialist solely because one physician is the treating physician is irrational. *See Peabody Coal v. Director, Off. of Worker's Compensation Programs,* 972 F. 2d 178, 182 (7th Cir. 1992). An ALJ is not required or indeed permitted to accept medical evidence if it is refuted by other evidence, which need not itself be medical in nature. *See Simila,* 573 F. 3d at 515.

Here, the ALJ gave treating physician Dr. Dubey's opinion little weight based on inconsistencies within his own opinion and with the record as a whole. In his opinion, Dr. Dubey diagnosed Renfrow with extreme limitations including poor or no ability to follow work rules, use judgment, maintain attention and concentration, and behave in an emotionally stable manner. Dr. Dubey also opined that Renfrow suffered from an extreme loss in her ability to make simple work-related decisions, respond to usual work situations, or deal appropriately with supervisors or co-workers. Lastly, Dr. Dubey stated that Renfrow had a total loss in her ability to deal with changes in a routine work setting.

Notably, the ALJ supported the discounted weight given Dr. Dubey's opinion with reference to an inconsistency within the medical opinion itself. Specifically, the ALJ compared Dr. Dubey's assessment that Renfrow retained poor or no ability to use judgment with his statement that she could manage benefits in her own interest.

The ALJ also demonstrated inconsistencies between Dr. Dubey's opinion and the record as a whole. For instance, the ALJ stated that the extreme limitations put forth by Dr. Dubey are inconsistent with the symptoms described in the evaluation conducted by consultative psychologist Dr. Caldwell. The ALJ relied on Dr. Caldwell's evaluation, which determined that Renfrow suffered from no more than mild symptoms. The ALJ also noted Renfrow's GAF score of 62 assigned by Dr. Caldwell, which indicated that she was generally functioning pretty well.

9

While the ALJ gave great weight to Dr. Caldwell's opinion overall, he specifically gave only some weight to Dr. Caldwell's GAF score because such a high score was not consistent with the overall medical evidence of Renfrow's mental functioning over time.

Additionally, the ALJ highlighted therapy and treatment records showing Renfrow's improvement and found that they did not support the restrictions provided for in Dr. Dubey's opinion. As an example, the ALJ referenced a record from the Bowen Center in January 2013 noting that Renfrow's ability to stand up to her husband and navigate her emotionally challenging marriage was improving. In addition, the ALJ noted treatment notes from January 2013, which stated that Renfrow's improvement was stable and were inconsistent with Dr. Dubey's opinion that Renfrow could not deal with changes in a routine work setting or respond to usual work situations. The ALJ also noted inconsistencies between the record and Renfrow's reported activities of daily living, an issue that will be developed even further below related to the ALJ's credibility determination.

Based on his articulation of the internal inconsistencies in Dr. Dubey's opinion as well as the inconsistencies between Dr. Dubey's opinion and the record as a whole, the ALJ supported his decision to give only little weight to Dr. Dubey's opinion with substantial evidence as required. Despite this, Renfrow asks the Court to consider pieces of favorable evidence, such as lower GAF scores, in an attempt to diminish the noted inconsistencies. In doing so, Renfrow appears to invite the Court to substitute its own opinion for that of the ALJ or to re-weigh the evidence. The Court cannot accept Renfrow's invitation. *See Haynes*, 416 F.3d at 626. Moreover, the ALJ fulfilled his obligation to support his findings with substantial evidence and provided a logical bridge from the evidence to his conclusion about Dr. Dubey's opinion. *See Richardson,* 402 U.S. at 401; *Haynes,* 416 F.3d at 626. Furthermore, the ALJ's decision reflects

consideration of the factors described in 20 C.F.R. § 404.1527.  Thus, this Court finds no error in the weight that the ALJ accorded to Dr. Dubey's opinion.

### 2. The ALJ's credibility determination was reasoned, supported, and not patently wrong.

Renfrow also alleges that the ALJ's credibility determination related to her possible mental health symptoms is not supported by substantial evidence.  Renfrow reiterates her conclusion that the ALJ mischaracterized the evidence and findings consistent with her argument related to Dr. Dubey's opinion.  Because Renfrow does not clearly articulate any further arguments specific to the ALJ's credibility determination on this issue, the Court rests here on its analysis above.  However, Renfrow further argues that the ALJ's credibility determination is unsupported by substantial evidence because he failed to properly evaluate the testimony of Michael Renfrow, Jr. ("Mr. Renfrow"), Renfrow's husband, by "impliedly rejecting it."  Doc. No. 15 at 20.

When defining a claimant's RFC, an ALJ must consider all evidence in the record, including any testimony on her symptoms and their effects on her ability to work.  SSR 96-7p.  When evaluating a claimant's subjective symptoms, the ALJ must follow a two-step process.  *Id*.  First, the ALJ must consider whether there is an underlying medically determinable physical or mental impairment that can be shown by acceptable medical evidence and can reasonably be expected to produce the individual's pain or other symptoms.  *Id.*  Second, once an underlying physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms is determined, the ALJ must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities.  *Id.*  When the individual's statements

about the limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the individual's statements based on the consideration of the record. *Id.* An ALJ's decision regarding a claimant's credibility must contain specific reasons for the finding on credibility, be supported by evidence in the record, and be sufficiently specific to make clear to the claimant and to any subsequent reviewers the weight the ALJ gave to the claimant's statements and the reasons for that weight. *Id.*

A court reviews an ALJ's credibility determination with deference because the ALJ, and not a reviewing court, is in the best position to evaluate credibility. *Simila,* 573 F. 3d at 517. The ALJ's credibility determination does not have to be error free, so long as it is not patently wrong. *Id.* The ALJ's determination is only patently wrong when it lacks any explanation or support. *Elder v. Astrue,* 529 F. 3d 408, 413-14 (7th Cir. 2008). An ALJ's credibility determination will only be overturned if it is patently wrong. *Id.* Minimally, the ALJ needs to articulate his or her justification for rejecting or accepting specific evidence of disability. *Rice v. Barnhart,* 384 F. 3d 363, 371 (7th Cir. 2004). A claimant for social security benefits can establish the severity of his symptoms by his own testimony, but his subjective complaints need not be accepted if they clash with other, objective medical evidence in the record. *Arnold v. Barnhart*, 473 F. 3d 816, 823 (7th Cir. 2007). An ALJ may discount an applicant's testimony based on other evidence in the record. *Johnson v. Barnhart,* 449 F. 3d 804, 804 (7th Cir. 2006).

In this case, Renfrow claims the ALJ simply summarized Mr. Renfrow's testimony then rejected it with no further analysis after stating that her husband likely wanted to help her obtain benefits, which would inure to his benefit as well. Despite Renfrow's argument, however, the ALJ explicitly reported Mr. Renfrow's statements regarding his wife's ability to independently care for her personal hygiene and to perform household chores, such as cleaning, doing laundry,

and preparing dinner. The ALJ additionally compared Mr. Renfrow's own statements that his wife did not have a driver's license and would get nervous if she went out alone with his statements that she attended weekly bible study classes by herself and lunches with neighbors and spoke daily with her parents on the telephone. Despite finding these statements inconsistent, the ALJ nevertheless considered Mr. Renfrow's statements regarding his wife's difficulties with employment, finances, and personal problems resulting from her mental impairments. By discussing these parts of Mr. Renfrow's testimony, the ALJ properly evaluated his testimony and supported his decision to discount Mr. Renfrow's opinion as potentially motivated by self-interest. Moreover, the ALJ cited Renfrow's mental health history, her most current therapy records, her improved condition, and inconsistencies within her testimony to support his credibility determination.

In conclusion, the ALJ's decision does not lack support. The ALJ properly evaluated Mr. Renfrow's husband's testimony by pointing out his inconsistent statements within. Consequently, the ALJ's findings were reasoned and supported, not patently wrong, and will not be disturbed.

### B. Step Five Analysis

As a final argument, Renfrow asserts that because the RFC was allegedly in error, the instruction given to the vocational expert by the ALJ at the hearing is also in error. However, having found that the ALJ's RFC determination is supported by substantial evidence, the Court need not address this Step Five argument because this opinion and order has not changed the ALJ's RFC determination.

### V. CONCLUSION

As discussed above, the ALJ's decision to discount the weight of treating physician Dr. Dubey was supported by substantial evidence. In addition, the ALJ's credibility determination

was not patently wrong.  Therefore, the ALJ's RFC determination is supported with substantial evidence and must stand.  Thus, this Court **AFFIRMS** the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g).  The Clerk is instructed to term the case and enter judgment in favor of the Commissioner.

**SO ORDERED.**

Dated this 25th day of January, 2016.

S/Christopher A. Nuechterlein  
Christopher A. Nuechterlein  
United States Magistrate Judge